J-A34023-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: C. KLINE, AN INCAPACITATED PERSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| | No. 772 MDA 2015 |

Appeal from the Order Entered March 25, 2015
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 83221

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:　　　　　　　　　　**FILED JANUARY 08, 2016**

Angela Biros brings this appeal from the order entered March 25, 2015, in the Court of Common Pleas of Berks County, Orphans' Court Division, that removed her as guardian of the person and estate of Cecilia Kline, an incapacitated person, and appointed a third party, Mark R. Sprow, Esquire, as guardian of the person and estate of Kline.[1, 2]  The court also

---

[1] The order at issue is an orphans' court order appealable as of right pursuant to Pa.R.A.P. 342(a)(5) ("An order determining the status of fiduciaries, beneficiaries, or creditors in an estate, trust or guardianship[.]").

[2] We note that although Biros filed her notice of appeal "from the order entered in this matter on March, 26, 2015," the trial court docket reflects that the court's order was "filed" on March 25, 2015.  Because Biros appealed on April 27, 2015, more than 30 days after March 25, 2015, we initially address the timeliness of this appeal.

*(Footnote Continued Next Page)*

found that a surcharge against Biros was appropriate for waste and apparent mismanagement of Kline's estate, but left the surcharge issue open.[3] Biros contends the court (1) erred or abused its discretion in failing to apply the correct legal standards adopted by the Pennsylvania Courts in removing her as guardian of Kline and imposing a surcharge, and failing to consider all the evidence presented at the hearing, and (2) was prejudicial to, or biased against, Biros, both during the hearing held on March 25, 2015, and when it

---
*(Footnote Continued)*

A notice of appeal must be filed within 30 days after entry of the order from which the appeal is taken. Pa.R.A.P. 903(a). The date of entry of an order is the day that the clerk of the court mails or delivers copies of the order to the parties. **See** Pa.R.A.P. 108(a). In a matter subject to the Pennsylvania Rules of Civil Procedure, the date of entry is the day that the clerk makes the notation in the docket that notice of entry of the order has been given pursuant to Pa.R.C.P. 236(b). Pa.R.A.P. 108(b); **Frazier v. City of Philadelphia**, 735 A.2d 113 (Pa. 1999). This Court has applied Rule 108(b) to determine the date of entry of an order of the Orphans' Court. **See In re: K.P.**, 872 A.2d 1227 (Pa. Super. 2005); **Estate of Keefauver**, 518 A.2d 1263 (Pa. Super. 1986), *appeal denied*, 533 A.2d 92 (Pa. 1987).

Here, although the docket reflects the subject order was "filed" on March 25, 2015, there is no indication on the docket that notice of the order was provided to Biros or any other party. Thus, the date that triggered the 30 day appeal period is not apparent from the docket. As such, we do not regard this appeal as untimely. **See Vertical Resources, Inc. v. Bramlett**, 837 A.2d 1193 (Pa. Super. 2003) (appeal was not untimely where there was no indication on the docket that Rule 236 notice was sent).

[3] Regarding the surcharge, the court ordered: "Within the next thirty days, counsel for the parties shall review the financial records of this matter and negotiate an appropriate surcharge amount for consideration and approval by the Court. Failing the ability to reach an amicable surcharge amount, the Court will appoint a master to make the findings and a recommendation to the Court regarding surcharge." Order, 3/25/2015.

entered the March 25, 2015 order. *See* Biros' Brief at 5. Based upon the following, we affirm.

Biros is the great-niece of Kline. This matter arose when Kline's great-niece, Pamela Rokoskie, who is Biros' sister,[4] petitioned the court to declare Kline an incapacitated person and appoint a plenary guardian. The orphans' court's opinion sets forth the background of this case, as follows:

> This guardianship matter began its tortuous path on July 9, 2013, when Cecelia Kline's great-niece, Pamela A. Rokoskie (Petitioner), filed a Petition for Adjudication of Incapacity and Appointment of Plenary Guardian for Ms. Kline. A hearing was scheduled for August 21, 2013. Apparently an off-the-record indication was made to the Court that the matter would be contested in some fashion because on July 26, 2013, the Court appointed counsel for Ms. Kline.
>
> On August 21, 2013, Angela Biros (Respondent), another great-niece, filed Response/Objections to the Petition indicating that she is the agent under Ms. Kline's power of attorney, that Ms. Kline is not incapacitated, and that even if Ms. Kline is incapacitated there is no need for a guardian because her needs are met. After some off-the-record discussion, the hearing was continued to September 27, 2013.
>
> On September 27, 2013, the parties took some time to reach an agreement regarding Ms. Kline's incapacity and who should serve as her guardian. The parties stipulated to the expert report, which concluded Ms. Kline was incapacitated and in need of a guardian. The parties agreed that [Biros] would be appointed guardian of Ms. Kline's person and estate. The parties also agreed to terms regarding family visits with Ms. Kline. The Court directed that [Biros] file an inventory and accounting within four months, and provided for the payment of fees to the doctor and Ms. Kline's court-appointed counsel. Although the

---

[4] *See* N.T., 3/25/2015, at 55.

Court ordered the appointment of [Biros] as guardian for Ms. Kline and directed the submission of a written order to that effect, counsel did not submit a written order.

On March 25, 2014, [Rokoskie's] attorney requested the transcript of the September 27, 2013 hearing. On April 23, 2014, [Rokoskie] filed a Petition for Special Relief to Memorialize Settlement Agreement to an Order of Court and Contempt of Court Order. [Rokoskie] alleged that she, through counsel, made several attempts to memorialize the parties' agreement into a stipulated order, but [Biros] refused to sign. [Rokoskie] also averred a failure by [Biros] to file an inventory and accounting, to pay Ms. Kline's attorney, Mr. Grenko, and to allow visits with Ms. Kline as agreed. [Rokoskie] requested an order to enforce [Biros'] compliance with the September 27, 2013 agreement or to remove [Biros] as guardian. A hearing on the Petition for Special Relief was scheduled for June 12, 2014.

On June 10, 2014, [Biros] filed an Answer to the Petition for Special Relief, an Inventory, and a First Account for the period of September 27, 2013 to January 31, 2014. After argument/hearing, the Court directed counsel to submit an order appointing [Biros] as Ms. Kline's guardian, directing [Biros] to file an account for the time period of April 22, 2013 through the present, and otherwise memorializing the terms of the September 27, 2013 agreement, including payment of Mr. Grenko. That Order was signed on June 24, 2014.

On July 7, 2014, [Biros] filed a Motion for Reconsideration alleging the existence of discrepancies in the written order as compared to the Court's oral instructions. On July 11, 2014, the Court issued an Order slightly modifying certain terms contained in the June 24, 2014 Order.

On July 21, 2014, [Biros] filed Objections to Mr. Grenko's itemized bill. On July 28, 2014, Mr. Grenko filed an Answer to the objections and attached his invoice. On July 31, 2014, the Court ordered [Biros] to pay Mr. Grenko a slightly discounted sum from Ms. Kline's estate within ten days or face surcharge.

On August 27, 2014, [Biros] filed a First Amended Account for the period of April 22, 2013 to August 22, 2014.

- 4 -

On November 10, 2014, [Rokoskie] filed a Petition for Special Relief and Contempt of Court Order. [Rokoskie] averred a list 30 payments or withdrawals from Ms. Kline's funds that did not appear in the August 27, 2014 account. [Rokoskie] averred that [Biros] made payments to herself and to her daughter and liquidated certificates of deposit without accounting for the liquidated sums, which exceeded $123,000. [Rokoskie] also averred [Biros'] relocating Ms. Kline from her home to undisclosed facility. [Rokoskie] requested that [Biros] be removed as guardian and agent under power of attorney and be ordered to return certain sums to Ms. Kline and comply with [Rokoskie's] Request for Production of Documents that was issued in July 2014.

On November 20, 2014, a rule was issued upon [Biros] to show cause why she should not be held in contempt of court, be removed as guardian and agent, and be ordered to return assets and produce discovery. The rule was returnable December 12, 2014, and a status conference was set for December 17, 2014. After the conference, the Court entered an order directing [Biros] to produce request[ed] discovery, capping payment of monthly expenses not directly related to Ms. Kline's care, and prohibiting Respondent from receiving any payments for her services as guardian. Counsel were given time to attempt an amicable resolution.

On February 11, 2015, the Court scheduled a hearing on the Petition for Special Relief and Contempt of Court Order for March 18, 2015. On request of [Biros'] counsel, the hearing was continued to March 25, 2015. The Court also froze Ms. Kline's accounts.

Orphans' Court Opinion, 6/11/2015, at 1–4.

The hearing in this matter took place on March 25, 2015. On the same day, the orphans' court removed Biros as guardian for Kline and appointed a third-party, Mark R. Sprow, Esquire, as Kline's guardian. The court also found that because of Biros' waste and mismanagement of the estate, a surcharge was appropriate. The court ordered the surcharge

amount would be determined by the parties or, failing that, a master. ***See***

Order, March 25, 2015. This appeal followed.[5]

In reviewing the decision of the orphans' court judge to remove a

guardian, our standard of review is well settled:

> In the case of a petition for removal of a guardian, our Court's
> role is to determine whether the orphans' court abused its
> discretion. The power of the orphans' court to remove a guardian
> is an inherent right, which will not be disturbed unless there is a
> gross abuse of discretion.

***In re Estate & Pers. of Border***, 68 A.3d 946, 959 (Pa. Super. 2013).

Section 5515 of the Probate, Estates and Fiduciaries (PEF) Code, which

addresses court removal of a guardian, incorporates Section 3182 (regarding

grounds for removal) and Section 3183 (regarding procedure for removal),

related to decedent's estates. ***See*** 20 Pa.C.S. § 5515. Section 3182 sets

forth the grounds for removing a personal representative, stating, in part:

> The court shall have exclusive power to remove a personal
> representative when he:
>
> (1)    is wasting or mismanaging the estate, or is likely to
>        become insolvent, or has failed to perform any duty
>        imposed by law; or
>
> …
>
> (5)    when, for any other reason, the interests of the
>        estate are likely to be jeopardized.

---

[5] Biros timely complied with the order of the orphans' court to file a concise statement pursuant to Pa.R.A.P. 1925(b).

20 Pa.C.S. § 3182(1), (5). The orphans' court, in removing Biros, cited

Section 3182(1) and (5). **See** Orphans' Court Opinion, 6/11/2015, at 5.

In its opinion authored in support of its decision, the court discussed

Biros' actions after her September 27, 2013, appointment of guardian of the

person and estate of Kline. The court found:[6]

> At the hearing on March 25, 2015, [Rokoskie] called [Biros] as the first witness as on cross examination. Much of the examination concerned entries in a check register. [Biros] explained certain entries as describing expenses incurred for toiletries, groceries, and lawn maintenance. Some of the purchases were made by Ms. Kline with a credit card, even after she was adjudicated incapacitated. Other purchases were paid by [Biros] at Ms. Kline's direction.

> [Biros] let Ms. Kline do her own banking — [Biros] took her to the bank but gave her privacy as she engaged in the transactions herself. In July and/or August 201[4], [Biros], [who had acted] as agent under the power of attorney [prior to her appointment as guardian of Kline], had at least one of Ms. Kline's bank accounts re-titled as a joint account with [Biros] and/or had [Biros] added as a POD beneficiary as Ms. Kline allegedly wished.

> [Biros] stated that monies that she paid to herself and her daughter were paid at Ms. Kline's direction upon terms set by Ms. Kline. For example, in deciding to pay herself for yard work performed, [Biros] asked Ms. Kline, the adjudicated incapacitated person, what she would pay for the services in order to set her pay scale. [Biros] also accepted money from Ms. Kline on account of [Biros'] caring for her. [Biros] acknowledged several $1,000 payments to herself for services rendered, but she never obtained a court order authorizing

---

[6] The court noted in its opinion: "[Biros] has not ordered a transcript of the March 25, 2015 hearing. The within statements regarding the evidence presented are based on the Court's notes and recollection of the testimony." Orphans' Court Opinion, 6/11/2015, at 4 n.1.

payments to herself. [Biros] repeatedly testified that the checks written to herself were written at Ms. Kline's request and that Ms. Kline decided the amounts.

[Biros] acknowledged that Ms. Kline is no longer occupying her residence. [Biros] testified that she continued to maintain the residence at Ms. Kline's direction rather than sell the wasting asset. [Biros] had no plans or intentions to sell the real estate.

[Rokoskie] testified that she believes [Biros] is mishandling Ms. Kline's funds and causing problems with [Rokosie's] ability to visit with Ms. Kline. She indicated readiness to serve as successor guardian. On cross-examination, it was revealed that [Biros] was convicted of welfare fraud approximately 11 years ago.

It is clear that there is animosity between [Rokoskie] and [Biros]. It is clear that [Biros] is not taking her fiduciary responsibility as guardian seriously. It is clear that as guardian, [Biros] is to be the decision-maker. The incapacitated person should not be the decision-maker, or the banker, or the bill-payer. While it might be admirable that the guardian would consider the wishes of her ward, the key word here must be "consider," not "blindly follow." The guardian also cannot be self-dealing with the incapacitated person's funds. If [Biros] had a legitimate reason to be paying herself anything, she should have obtained court approval first. [Biros] had the duty to safe-guard Ms. Kline's estate for Ms. Kline, not for [Biros]. This duty also included selling real estate that is not occupied and consuming funds that could and should be preserved for Ms. Kline's care.

Orphans' Court Opinion, 6/11/2015, at 4–5.

Biros first challenges the court's order on the grounds that the court failed to apply the correct legal standard adopted by the Pennsylvania courts in removing her as guardian and imposing a surcharge, and failed to consider all of the evidence presented during the March 25, 2015, hearing. *See* Biros' Brief at 5, 9.

In this regard, Biros cites Section 5502 of the PEF Code, as follows:

Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them, which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes these objectives through the use of the least restrictive alternative; and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians.

20 Pa.C.S. § 5502. Biros also relies on Section 5521(a) of the PEF Code, which defines the "Duty of the guardian of the **person**," and states, in part: "Expressed wishes and preferences of the incapacitated person shall be respected to the greatest possible extent." 20 Pa.C.S. § 5521(a).

Biros argues not only did the court fail to apply these standards, the court ignored these standards when it stated at the hearing:

The lady is adjudicated incompetent (sic). Anything she says, I'm going to give no credence to, whatsoever. [N.T., 3/25/2015, at 47.]

Let me be clear one more time. When was the last time you expected any legal authority or ramifications from an adjudicated incompetent (sic) person? [*Id.* at 60.]

"You can say with confidence an adjudicated incompetent (sic) person can say to you that we have a warm and loving relationship? [*Id.* at 61–62.]

I can't fathom anyone asking – it would be like me asking a 2-year old child, "Do you want to – "what do you want to do today? And have them say, "I want to have a lollipop," so you give them a lollipop. [*Id.* at 75.]

> This person was adjudicated incompetent (sic). She has no say in what happens now. ***Id.*** at 75.

***See*** Biros' Brief at 10. Further, Biros notes the court's decisions of September 27, 2013, June 24, 2014, and July 11, 2014, had allowed Kline to decide whether to have visitors at her residential facility and whether to receive phone calls. Biros maintains the court's earlier orders sent mixed messages to Biros compared to the messages she received during the hearing and from the court's March 25, 2015, order. ***See id.*** at 10. Biros argues the court failed to treat Kline with dignity and respect and refused to give Kline the legal rights to which she is entitled under the PEF Code. ***See id.*** at 11.

> Biros states she:

> has known Kline her entire life, and they have always had a loving, wonderful and close relationship. As her guardian, Biros also wanted to respect Kline's wishes, consistent with the mandates of the PEF Code. That included accepting payments from Kline for providing services as the guardian of her person and estate, in the total amount of Five Thousand Dollars ($5,000.00) for the period from September 27, 2013 (the date Biros was appointed) to March 25, 2015 (the date she was removed), and not selling Kline's residence[.]

***Id.*** at 11 (reproduced record citations omitted).

Biros further argues she has never used Kline's credit or debit cards, and each time she received money from Kline, it was for services she performed for Kline. She would see Kline twice a day, take her to doctor's appointments and lunch dates, read the newspaper to her, and, during

December, 2014, and January, 2015, stayed overnight with Kline to make sure her needs were met and to save her from paying a service for care. Biros states she has never hidden any financial transactions during the time she was appointed guardian, as evidenced by the accounts she filed with the court. Biros claims the trial court and Rokoskie attempted to focus on Kline's financial actions prior to the time that Biros was appointed guardian of the person and estate of Kline on September 27, 2013. **See** Biros' Brief at 12–13.

Finally, Biros argues Kline's wishes did not harm her. **See id.** at 13. She argues the fact that Kline's wishes were followed added to Kline's quality of life as Kline wanted to pay Biros for her services, and wanted to see her house when she was taken out of the residential facility and was happy to see it well-maintained. **Id.** at 14. Biros claims there was no imminent need to sell the residence in light of Kline's liquid assets of over $200,000.00 and because her current residential facility accepts Medicare. **Id.** at 14–15.

Based on our review, we find Biros' argument presents no basis to disturb the decision of the orphans' court judge.

An "incapacitated person" is defined in the PEF Code as

> an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety.

20 Pa.C.S. § 5501. In this case, the parties stipulated to the evaluation report of Gary Champlin, Ph.D.,[7] a clinical psychologist, concluding Kline was an incapacitated person, **see** 20 Pa.C.S. § 5518, and in need of a guardian of the person and estate. **See** N.T., 9/27/2013, at 7, 8. Furthermore, pursuant to the parties' agreement, the court appointed Biros "plenary guardian" of Kline, as opposed to a "limited guardian." **Id.** at 3, 8; Order, 7/11/2014; Order, 6/24/2014. The PEF Code provides:

> The court may appoint a plenary guardian of the person only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

20 Pa.C.S. § 5512.1(c).

> A court may appoint a plenary guardian of the estate only upon a finding that the person is totally incapacitated and in need of guardian services.

20 Pa.C.S. § 5512.1(e). Therefore, because Biros was appointed "plenary guardian" of Kline, Kline is presumed to be "totally incapacitated" as to her ability to manage her financial resources and make decisions concerning her physical health and safety.

In terms of the petition for removal of Biros as guardian of the estate of Kline, contrary to the argument of Biros, our review confirms the court properly considered only the evidence of Biros' actions while she was acting

---

[7] The evaluation report of Dr. Champlin is not included in the certified record.

as guardian of Kline. Although Rokoskie's counsel elicited testimony from Biros regarding cash withdrawals by Kline in the time period before Biros was appointed guardian, when Biros was Kline's agent under a power of attorney, the court explicitly recognized "all of these … took place prior to her guardianship." N.T., 3/25/2015, at 27.

Furthermore, the fact that Kline's checking account, on which Biros was titled as attorney in fact, was retitled, after Biros' appointment as guardian, to make the account payable on death (POD) to Biros,[8] is alone sufficient to justify Kline's removal, since there is no evidence that Biros received court approval. When Biros retitled the account by naming herself as the POD beneficiary, Biros was, in effect, engaging in estate planning. Biros needed, but did not obtain, court approval pursuant to Section 5536(b) of the PEF Code, which provides, in relevant part:

> The court, upon petition and with notice to all parties in interest and for good cause shown, shall have the power to substitute its judgment for that of the incapacitated person with respect to the estate and affairs of the incapacitated person for the benefit of the incapacitated person ….

20 Pa.C.S. § 5536(b).

Moreover, the evidence showed that during the guardianship period Biros paid herself from Kline's funds multiple times, including a number of

_____

[8] Biros testified that Kline "wanted it done that way," and she "[did] not know why." N.T., 3/25/2015, at 31.

flat $1,000.00 payments for assistance to Kline.[9, 10] Biros testified, "[S]he [Kline] requested these checks to be written to me and it was for cumulative things, of taking care of her, taking care of the property, doing everything for her. She made the decision of what the amount is." N.T., 3/25/2015, at 20. However, there is no evidence that Biros sought or was granted court approval for these payments as required under the PEF Code. In this regard, Section 5536 provides, in relevant part:

> The court, for cause shown and with only such notice as it considers appropriate in the circumstances, may authorize or direct the payment or application of any or all of the income or principal of the estate of an incapacitated person for the care, maintenance or education of the incapacitated person ….

20 Pa.C.S. § 5536(a).

---

[9] The following checks payable to Biros were identified at the hearing as being written after September 27, 2013:

Check
#25[sic] — $1,000.00 for "August/September supplies." N.T., **supra**, at 8.
#2474 — $240.00 for "yard work." **Id.**
#2486 — $125.00 for "lawn care." **Id.** at 9.
#2549 — $1,000.00 for "taking care" of Kline. **Id.** at 10–11.
#2564 — $1,000.00 for "services as a guardian." **Id.** at 11, 18.
#2579 — $300.00 for "yard work." **Id.** at 11.
#2590 — $1,000.00 for "Yard work." **Id.** at 13.
#2595 — $1,000.00 for "Yard Work." **Id.** at 19.
#2605 — $1,000.00 for "Services." **Id.** at 21.
#2617 — $500.00 for "Services." **Id.**
#2620 — $500.00 for "Yard Work." **Id.**

[10] During the guardianship, Biros' daughter also received a $1,000.00 payment from Kline's funds. **See** N.T., 3/25/2015, at 20.

While it is troubling that Biros testified she had never seen the court's forms for "Periodic Report of the Guardian, the Notification of Mental Commitment form, the Inventory and Valuations forms and the Guardian Acknowledgement of Duties and Liabilities form,"[11] it is clear under the PEF Code that it was improper for Biros to retitle Kline's checking account to make herself the POD beneficiary and to pay herself from Kline's funds without court approval.

In addition, although Kline had not lived at her home for over one-and-one-half years and her residential care was $10,500.00 monthly at the time of the hearing, the residence remained vacant and property-related expenses continued to be paid.[12] The residence was not rented to anyone,

_____

[11] N.T., 3/25/2015, at 38.

[12] Biros testified that Kline moved to a facility, Columbia Cottage, in August, 2013, and rent there was approximately $6,000.00. N.T., 3/25/2015, at 31–32, 35. Biros further stated Kline moved to Country Meadows in October, 2014, when "the level of care [Kline] was getting had dropped dramatically and they increased her rent dramatically." *Id.* at 32. Country Meadows recommended Kline be placed in a skilled nursing facility, and Kline was moved to Berks Heim at the end of January, 2015. *See id.* at 35.

Biros testified Kline receives Social Security of $1,084 per month, and that the cost of Berks Heim, where Kline resides, is $10,500.00 a month. N.T., 3/25/2015, at 33. Biros acknowledged Kline's total assets, based on the inventory filed by Biros, were $229,000.00, of which $93,000.00 is the value of the real estate. *See id.* Biros testified she intended to keep Kline at Berks Heim "[u]ntil she dies," and that she would sell Kline's house after Kline depletes her cash. *Id.* at 34.

*(Footnote Continued Next Page)*

and Biros had the power to lease Kline's residence. **See** 20 Pa.C.S. § 5521(b).

Although we acknowledge that it can be emotionally helpful for an incapacitated person to keep their vacant home, in this case the evidence demonstrates that because the level of care had increased to skilled nursing, there was no realistic expectation of Kline's return home. The move to Berks Heim was evidence of the increasing need for the revenue and savings that would result from the sale of the residence.[13]

*(Footnote Continued)* ───────────

Biros also stated she would sell the house "when [Kline] instructs me to or when I need to." **Id.** at 36. Biros testified she did not think Kline wanted her to sell the house. **See id.** at 71–72. She further testified, "When I take [Kline] out and drive her by the house, she wants to see the house." **Id.** at 73.

[13] While Biros relies on **In re Estate of Rosengarten**, 871 A.2d 1249 (Pa. Super. 2005), in arguing that she followed Kline's wishes not to sell the house, we find that **Rosengarten** is distinguishable.

In **Rosengarten**, Ms. Rosengarten, who suffered from bipolar disorder and had been adjudicated incapacitated, had assets that were valued at approximately $900,000, including a residence in Newtown, Pennsylvania, with a value of approximately $280,000. **Id.**, 871 A.2d at 1251. Ms. Smith, the guardian of the person and estate of Ms. Rosengarten, petitioned the court to remove the trustee of Rosengarten's living trust, Mr. Cohen, who was Rosengarten's father, after he opposed Smith's proposal to sell Rosengarten's home. **Id.** Subsequently, an attorney entered his appearance on behalf of Rosengarten and filed an answer and new matter to the petition that (1) opposed the removal of the trustee, and (2) requested that Mr. Cohen be appointed guardian, that Rosengarten's house be rented rather than sold, and that a review hearing be held on the issue of her incapacity. Rosengarten further alleged the guardian was not acting in her best interests. **Id.** at 1251–1252.

*(Footnote Continued Next Page)*

The court's comments at the hearing regarding Kline's incapacity may seem harsh, but the court was correct that Biros should not have relied on Kline's wishes in financial matters. We recognize the tension between the language of Section 5502 and the appointment of a plenary guardian based on a finding of total incapacity but we cannot conclude, on this record, that the orphans' court abused its discretion.[14] Therefore, there is no basis upon

_(Footnote Continued)_ _____

The orphans' court did not conduct the requested review hearing regarding Rosengarten's continued incapacity, and did not consider whether Mr. Cohen should be appointed guardian and the related allegations that the guardian's fees were exorbitant and unnecessary, and that the guardian was not acting in the best interests of Ms. Rosengarten. *Id.* at 1252. Rather, the court proceeded to hold a hearing on the guardian's petition for removal and the sale of Rosengarten's home. *Id.* at 1252. The court denied the petition for removal of Mr. Cohen as trustee, and authorized the sale of Rosengarten's house and personal property. *Id.* at 1253.

On appeal, this Court held that: 1) Rosengarten had standing to pursue the appeal; 2) she has the right to be represented by counsel of her choice; and 3) that the orphans' court committed error by proceeding to order the sale of Ms. Rosengarten's real estate without first conducting a hearing on a) her allegation that she was no longer incapacitated, and b) her allegation that her guardian was not acting in her best interest and her related request that her father be appointed guardian. *Id.*, at 1250.

We note that in this case, unlike **_Rosengarten_**, no issue has been raised regarding Kline's continued incapacity or ability to return home. We also note that Rosengarten's total assets were $900,000.00, compared to Kline's total assets of $229,628.12. **See** N.T., 3/25/2015, at 23.

[14] We find that the language of Section 5521(a), "Duty of the guardian of the person," cannot be read into Section 5521(b), "Duty of the guardian of the estate." Furthermore, Section 5521(a) is certainly more applicable to the appointment of a **limited** guardian of the person.

which to disturb the court's decision to remove Biros as plenary guardian of the estate of Kline.

While Biros challenges her removal as guardian without making any distinction between guardianship of the estate and guardianship of the person, we separately address Biros' removal as plenary guardian of the person. We recognize there are inconsistencies between the court's prior orders permitting Kline to decide whether to allow visitors and take phone calls and the court's statements at the hearing and its March 25, 2015, decision, but Rokoskie's uncontradicted testimony was that Biros told the nurses at Berks Heim not to allow Rokoskie to visit Kline. *See* N.T., 3/25/2015, at 57, 60.[15] The court cited the "animosity between the parties"[16] and we find that this reason supports the court's decision to

---

[15] Rokoskie testified she believed that Kline was being isolated from her family members. *See* N.T., 3/25/2015, at 41. She testified that although she had had regular contact with Kline, after Biros' appointment as guardian, she had attempted to visit Kline 165 times, and was only granted permission 40 times. *See id.* at 42. Rokoskie also stated she was not made aware of Kline's relocations. *See id.* She testified she only discovered Kline was at Columbia Cottage when the parties were in court. *See id.* at 56. She further testified she notified Biros she was going for a visit at Country Meadows, and when she went there she was told Kline was no longer a resident. *See id.* She found out that Kline was at Berks Heim "right before we came back to this Court," when it was disclosed to her attorney. *Id.* at 57. She testified that when she went to visit Kline at Berks Heim on the Monday before the hearing, "the nurse had instructions from [] Biros to stop me." *Id.* at 57. *See also id.* at 60.

[16] Orphans' Court Opinion, 6/11/2015, at 5.

- 18 -

remove Biros as guardian of Kline's person and appoint an independent, third-party guardian.

Accordingly, for all of the above-stated reasons, we reject Biros' first argument that the court erred or abused its discretion in failing to apply the correct legal standards adopted by the Pennsylvania Courts in removing her as guardian of Kline and imposing a surcharge.

Secondly, Biros argues that the orphans' court "was prejudicial to, or biased against, Biros both during the hearing held on March 25, 2015, and when it entered the March 25, 2015 order." Biros' Brief at 15. This identical issue was raised in Biros' Pa.R.A.P. 1925(b) statement of errors complained of on appeal. *See* Biros' Concise Statement, 5/6/2015, at ¶9. We note, however, Biros' concise statement did not identify any of the specific instances of bias that are identified by Biros in her brief with citation to the notes of testimony. *See* Biros' Brief at 15–17. We further note that Biros did not order a transcript of the March 25, 2015, hearing until after the court had issued its opinion. *See* Orphans' Court Opinion, 6/11/2015, at 4 n.4 ("[Biros] has not ordered a transcript of the March 25, 2015 hearing."). *See also* Order for Transcription, 7/8/2015.

Given that Biros failed to bring to the attention of the orphans' court the specific instances of alleged bias that are now raised in the brief, we conclude the issue of bias has been waived. *See* Pa.R.A.P. 1925(b)(4)(vii)

("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/2016